# UNITED STATES SUPREME COURT.

## PRESIDENT, DIRECTORS AND COMPANY OE THE VEAZIE BANK agt. JEREMIAH FENNO, collector.

" *Every national banking association, state bank,* or *state banking association,* shall pay a *tax of ten per centum* on the amount of *notes* of any person, state bank, or state banking institution, used for circulation, and paid out by them, after the 1st day of August, 1866 ; and such tax shall be assessed and paid in such manner as shall be prescribed by the commissioner of internal revenue." *(Act of Congress, July 1st,* 1866; 14 *U. S. St.,* 146.)

This law is *not repugnant to the Constitution of the United States,* as being a direct tax, which requires to be apportioned among the states agreeable to the constitution; because it is *not a direct tax,* within the meaning of the constitution. Nor is it unconstitutional as *impairing a franchise granted by the state;* for it is not the *franchise* of the banks which is sought to be taxed, but the *property created or contents made and issued by them.*

The *power to tax* may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people, by whom its members are elected; so that if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, therefore, be pronounced contrary to the constitution.*

(NELSON *and* DAVIS, *Justices, dissented.)*

Chief Justice CHASE delivered the following opinion :

THE necessity of adequate provision for the financial exigencies created by the late rebellion suggested to the administrative and legislative departments of the government, important changes in the systems of currency and taxation which had hitherto prevailed. These changes,

---

* Suppose the tax imposed by congress upon the circulation of state banks was confessedly so excessive as to close them up and render their franchises entirely nugatory, would not such a tax be clearly unconstitutional, as destroying a franchise granted by the state? The object for which the franchise was granted, being *taxed to death,* the franchise itself must fall ; consequently if it is unconstitutional to tax the franchise of a state bank directly and in terms, and thus fatally impair it, the same result must follow by taxing its circulation out of existence. Then the question in this case would be, whether the tax of *ten per centum* on their circulation is sufficient effectually to produce that effect; and if not, then the question arises, does not this tax indirectly *impair the franchise* to a certain extent, contrary to the constitution.—REP.

more or less distinctly shown in administrative recommen-
dations, took form and substance in legislative acts.  We
have now to consider, within a limited range, those which
relate to circulating notes and taxation of circulation.  At
the beginning of the rebellion, the circulating medium con-
sisted almost entirely of bank notes issued by numerous
independent corporations, variously organized under state
legislation, of various degrees of credit, and very unequal
resources, administered often with great—and not unfre-
quently with little—skill, prudence and integrity.  The
acts of congress then in force prohibiting the receipt or dis-
bursement, in the transactions of the national government,
of anything except gold and silver, and the laws of the state
requiring the redemption of bank notes in coin on demand,
prevented the disappearance of gold and silver from circula-
tion.      There was then no authorized national currency
except coin, and no national taxation was imposed in any
form on the state bank circulation.

The first act authorizing the emission of notes by the
treasury department for circulation was that of July 17,
1861 (12, *U. S. St.*, 259).  The notes issued under this act
were treasury notes, payable on demand in coin.  The
amount authorized by it was $50,000,000, and was increased
by the act of February 12, 1862 (12, *U. S. St.*, 338) to
$60,000,000.  On the 31st of December, 1861, the state
banks suspended specie payment.  Until this time the ex-
penses of the war had been paid in coin or in the demand
notes just referred to, and for some time afterwards they
continued to be paid in these notes, which, if not redeemed
in coin, were received as coin in the payment of duties.
Subsequently, on the 25th of February, 1862 (12, *U. S. St.*,
341), a new policy became necessary, in consequence of the
suspension and the condition of the country, and was
adopted.  The notes hitherto issued, as has just been stated,
were called treasury notes, and were payable on demand in
coin.  The act now passed authorized the issue of bills for

circulation, under the name of United States notes, made payable to bearer, but not expressed to be payable on demand, to the amount of $150,000,000, and this amount was increased by subsequent acts to $450,000,000 of which $50,000,000 were to be held in reserve and only to be issued for a special purpose and under special directions as to withdrawal from circulation. (*Act of July* 11, 1862, 12 *U. S. St.*, 532 ; *act of March* 3, 1863, 12 *U. S. St.*, 710.) These notes, until after the close of the war, were always convertible into, or receivable at par for bonds payable in coin, and bearing coin interest at a rate not less than five per cent ; and the acts by which they were authorized declared them to be lawful money and a legal tender. This currency, issued directly by the government for the disbursement of the war and other expenditures, could not obviously be a proper object of taxation ; but on the 25th of February, 1863, was passed the act authorizing national banking associations (12 *U. S. St.*, 670), in which, for the first time during many years, congress recognized the expediency and duty of imposing a tax upon currency. By this act a tax of ten per cent annually was imposed on the circulation of the associations authorized by it. Soon after, by the act of March 3, 1863 (12 *U. S. St.*, 712), a similarly lighter tax of one per cent annually was imposed on the circulation of state banks in certain proportions to their capital and of two per cent on the excess, and the same act reduced the tax on the national associations to the same rate. Both acts also imposed taxes on capital and deposits, which need not be noticed here. At a later date, by the act of June 3, 1864 (13, *U. S. St.*, 111), which was substituted for the act of February 25, 1863, authorizing national banking associations, the rate of tax on circulation was continued and applied to the whole amount of it, and the shares of their stockholders were also subject to taxation by the states ; and a few days afterwards by the act of June 30, 1864 (13, *U. S. St.*, 277), to provide ways and means

for the support of the government, the tax on the circulation of the state banks was also continued at the same annual rate of one per cent, as before, but payment was required in monthly instalments of one-twelfth of one per cent, with monthly reports from each state bank of the amount in circulation.    It can hardly be doubted that the object of this provision was to inform the proper authorities of the exact amount of paper money in circulation, with a view to its regulation by law.    It was the first step taken by congress in that direction, and it was followed, some months later, by the act of March 3, 1865, amendatory of the prior internal revenue acts, the sixth section of which provides " that every national banking association, state bank or state banking association shall pay a tax of ten per centum on the amount of the notes of any state bank or state banking association paid out by them after the 1st day of July, 1866." (13, *U. S. St.*, 484.)    The same provision was re-enacted, with a more extended application, on the 13th of July, 1866, in these words:—

" Every national banking association, state bank or state banking association shall pay a tax of ten per centum on the amount of notes of any person, state bank or state banking institution used for circulation and paid out by them after the 1st day of August, 1866, and such tax shall be assessed and paid in such manner as shall be prescribed by the commissioner of internal revenue."    (14, *U. S. St.*, 146.)

The constitutionality of the last provision is now drawn in question, and the brief statement of the recent legislation of congress has been made for the purpose of placing in a clear light its scope and bearing, especially as developed in the provisions just cited.    It will be seen that when the policy of taxing bank circulation was first adopted in 1863, congress was inclined to discriminate for, rather than against the circulation of the state banks ; but that when the country had been sufficiently furnished with a national currency by the issue of the United States and of national bank

notes, the discrimination was turned, and very decidedly turned, in the opposite direction.

The general question now before us is whether or not the tax of ten per cent imposed on state banks or national banks, paying out the notes of individual or state banks used for circulation, is repugnant to the constitution of the United States.  It is presented by a certificate of division of opinion between the judges of the circuit court of the United States for the district of Maine, in a suit brought by the president, directors and company of the Veazie Bank against Jeremiah Fenno, collector of internal revenue, for the recovery of the tax, penalty and costs, paid by the bank to the collector under protest, and to avoid distraint.  The Veazie bank is a corporation chartered by the state of Maine, with authority to issue bank notes for circulation ; and the notes on which the tax imposed by the act was collected were issued under this authority.  There is nothing in the case showing that the bank sustained any relation to the state as a financial agent, or that its authority to issue notes was conferred or exercised with any special reference to other than private interests.  The case was presented to the circuit court upon an agreed statement of facts, and upon a prayer for instructions to the jury the judges found themselves opposed in opinion on three questions, the first of which was this—whether the second clause of the ninth section of the act of congress of the 13th of July, 1866, under which the tax in this case was levied and collected, is a valid and constitutional law.  The other two questions differ from this in form only, and need not be recited.

In support of the position that the act of congress, so far as it provides for the levy and collection of the tax, is repugnant to the constitution, two propositions have been argued with much force and earnestness.  The first is, that the tax in question is a direct tax and has not been apportioned among the states agreeably to the constitution.  The second is, that the act imposing the tax impairs a franchise

granted by the state, and that congress has no power to pass any law with that intent or effect. The first of these propositions will be first examined. The difficulty of defining with accuracy the terms used in the clauses of the constitution which confer the power of taxation upon congress, was felt in the convention which framed that instrument, and has always been experienced by courts when called upon to determine their meaning. The general intent of the constitution, however, seems clear. The general government, administered by the congress of the confederation, had been reduced to the verge of impotency by the necessity of relying for revenue upon requisitions on the states; and it has a leading object in the adoption of the constitution, to relieve the government to be organized under it from this necessity and confer upon it ample power to provide revenue by the taxation of persons and property. And nothing is clearer, from the discussions in the convention and the discussions which preceded final ratification by the necessary number of states, than the purpose to give the power to congress as to the taxation of everything except exports in its fullest extent. The purpose is apparent, also, from the terms in which the taxing power is granted. The power is "to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States." More comprehensive words could not have been used. Exports only are, by another provision, excluded from its application. There are, indeed, certain virtual limitations arising from the principles of the constitution itself. It would undoubtedly be an abuse of the power if so exercised as to impair the separate existence and independent self-government (*County of Lane vs. State of Oregon,* 7 *Wall.,* 73) of the state, or if exercised for ends inconsistent with the limited grants of power in the constitution.

And there are directions as to the mode of exercising the power. If congress sees fit to impose a capitation or other

direct tax, it must be laid in proportion to the census. If congress determines to impose duties, imposts and excises, they must be uniform throughout the United States. These are not properly limitations of power. They are simply rules prescribing the mode in which it shall be exercised by them. It still extends to every object of taxation except exports, and may be applied to every object of taxation to which it extends, in such measure as congress may determine. The comprehensiveness of the power thus given to congress may serve to explain, at least, the absence of any attempt by members of the convention to decline, even in the debate, the terms of the grant. The words used certainly described the whole power, and it was the intention of the convention, that the whole power should be conferred. The definition of particular words, therefore, became unimportant. It may be said, indeed, that this observation, however just in its application to the general grant of power, cannot be applied to the rules by which different descriptions of taxes are laid and collected. Direct taxes must be laid and collected by the rule of apportionment. Duties, imposts and excises must be laid and collected under the rule of uniformity. The meaning of the first rule is very clear, but there has always been a diversity of opinion as to the subjects to which it is to be applied. The sense of congress has been shown, as we think quite clearly, in every act imposing direct taxes. In each of these acts a gross sum has been levied upon the United States, and the total amount has been apportioned to the several states, according to their respective numbers of inhabitants as ascertained by the last preceding census. Having been apportioned, provision is made for the imposition of the tax upon the subjects specified in the acts fixing its total sum. In 1798, when the first direct tax was imposed, the total amount was fixed at $2,000,000 (authorities cited). In 1813 the amount of the second direct tax was fixed at $3,000,000. In 1815 the third at $6,000,000, and it was made an annual tax. In

1816 the provision making the tax annual was repealed by the repeal of the first section of the act of 1815, and the total amount was fixed for that year at $3,000,000. No other direct tax was imposed until 1861, when a direct tax of $20,000,000 was laid and made annual; but the provision making it annual was suspended, and no tax except that first made was ever apportioned. In each instance, the total sum was apportioned among the states by the constitutional rule, and was assessed at prescribed rates on the subjects of the tax. The subjects in 1798, 1813, 1815 and 1816 were lands, improvements, dwelling houses and slaves, and in 1861, land, improvements and dwelling houses only. Under the act of 1798 slaves were assessed at fifty cents each; under the other acts, according to valuation by assessors. This review shows that personal property, contracts, occupations and the like have never been regarded by congress as proper subjects of direct tax. It has been supposed that slaves must be regarded an exception to this observation. But the exception is rather apparent than real. As persons, slaves were proper subjects of a capitation tax, which is described in the constitution as a direct tax; as property they were, by the laws of some, if not most of the states, classed as real property, descendible to heirs. Under the first view they would be subject to the tax of 1798 or a capitation tax; under the latter they would be subject to the tax of the other years as a realty. That the latter view was taken by the framers of the acts after 1798, becomes highly probable, when it is considered that in the states where the slaves were held, much of the value which would otherwise attach to land passed into the slaves. If, indeed, the land only had been valued without the slaves, the land would have been subject to much heavier proportional imposition in those states than in the states where there were no slaves; for the proportion of tax imposed on each state was determined by population, without reference to the subjects on which it was to be assessed

The fact, then, that slaves were valued under the acts referred to, is far from showing, as some have supposed, that congress regarded personal property as a proper object of direct taxation under the constitution, shows only that congress, after 1798, regarded slaves for the purpose of taxation as realty.

It may be rightly affirmed, therefore, that in the practical construction of the constitution by congress direct taxes have been limited to taxes on land and taxes on polls or capitation taxes. And this construction is entitled to great consideration, especially in the absence of anything adverse to it in the discussions of the convention which framed, and of the convention which ratified the constitution. What does appear in those discussions, on the contrary, supports the construction. Mr. Madison says Mr. King asked what was the precise meaning of direct taxation, and no one answered. On another day, when the question of proportioning representation to taxation, and both to the white and three-fifths of the slave inhabitants, was under consideration, Mr. ELLSWORTH said:—" In case of a poll tax there would be no difficulty," and speaking, doubtless, of direct taxation, he went on to observe, " The sum allotted to a state may be levied without difficulty, according to the plan used in the state for raising its own supplies." All this, doubtless, shows uncertainty as to the true meaning of the term direct tax ; but it indicates, also, an understanding that direct taxes were such as may be levied by capitation and on lands and appurtenances, or perhaps by valuation and assessment of personal property upon general lists, for these were subjects from which the states at that time usually received their supplies. This view received the sanction of this court two years before the enactment of the first law imposing direct taxes *eo nomine*.

During the February term of 1796, the constitutionality of the acts of 1794, imposing duty on carriages, came under consideration in the case of *Hutton* agt. *The United*

*States.* Suit was brought by the United States against David Hutton, to recover the penalty imposed by the act, for not returning and paying duty on a number of carriages for the conveyance of persons, kept by the defendant for his own use. The law did not provide for the apportionment of the taxes, and if it was a direct tax, the law was confessedly unwarranted by the constitution. The only question in the case, therefore, was whether or not the tax was a direct tax. The case was one of great expectation, and a general interest was felt in its determination. It was argued in support of the law by Lee, attorney general, and Hamilton, recently secretary of the treasury ; in opposition to the tax, by Campbell, attorney for the Virginia district, and Ingersoll, attorney general of Pennsylvania. Of the justices who filled this bench, ELLSWORTH, PATTERSON and WILSON had been members, and conspicuous members of the constitutional convention, and each of the three had taken part in the discussions relating to direct taxation. ELLSWORTH, the chief justice, sworn into office that morning, not having heard the whole argument, declined taking part in the decision. CUSHING, senior associate justice, having been prevented by indisposition from attending to the argument, also refrained from expressing an opinion. The other judges delivered their opinions in succession, the youngest in commission delivering the first and the oldest the last. They all held that the tax on carriages, was not a direct tax within the meaning of the constitution. Justice CHASE was inclined to think that the direct taxes contemplated by the constitution are only two—a capitation, or poll-tax, and a tax on land. He doubted whether a tax by a general assessment of personal property can be included within the term direct tax. PATTERSON, who had taken a leading part in the constitutional convention, went more fully into the sense in which the words giving the power of taxation were used by that body. In the course of this examination he said :—" Whether direct taxes, in the sense of the constitution, comprehend

any other tax than a capitation tax and a tax on land is a questionable point. If congress, for instance, should tax in the aggregate, or mass, things that generally pervade all the states in the Union, then, perhaps, the rule of apportionment would be the most proper, especially if an assessment was to intervene. This appears from the practice of some of the states to have been considered a direct tax. Whether it be so under the constitution of the United States is a matter of some difficulty, but as it is not before this court it would be improper to give any decisive opinion upon it. I never entertained a doubt that the principle, I will not say the only object that the framers of the constitution contemplated as falling within the rule of apportionment, "was a capitation tax and a tax on land." IREDELL, delivering his opinion at length, concurred generally in the views of justices CHASE and PATTERSON. WILSON had expressed his opinions to the same general effect when giving the decision upon the circuit, and did not now repeat them. Neither chief justice ELLSWORTH nor justice CUSHING expressed any dissent, and it cannot be supposed, if in a case so important, their judgments had differed from those announced that an opportunity would not have been given them, by an order for reargument, to participate in the decision.

It may be safely assumed, therefore, as the unanimous judgment of the court, that a tax on carriages is not a direct tax; and it may further be taken as established, upon the testimony of PATTERSON, that the words direct taxes, as used in the constitution, comprehends only capitation taxes and taxes on land, and perhaps taxes on personal property by general valuation and assessments of the various descriptions possessed within the several states. It follows, necessarily, that the power to tax without apportionment, extends to all other objects. Taxes on other objects are included under the heads of taxes not direct, duties, imports and excises, and must be laid and collected by the rule of uniformity.

The tax under consideration is a tax on bank circulation, and may well be classed under the head of duties; certainly it is not, in the sense of the constitution, a direct tax. It may be said to come within the same category of taxes as the tax on incomes of insurance companies, which this court, in the case of *Toule* agt. *The Insurance Company,* held not to be a direct tax. Is it then, a tax on a franchise granted by a state, which congress upon any principle exempting the reserved powers of the states from impairment by taxation, must be held to have no authority to lay and collect. We do not say that there may not be such a tax. It may be admitted that the reserved rights of the states, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts and to employ all necessary agencies for legitimate objects, are not proper subjects of the taxing power of congress. But it cannot be admitted that franchises granted by a state are necessarily exempt from taxation, for franchises are property, often very valuable and productive property, and when not conferred for the purpose of giving effect to some reserved powers of a state, seem to be as properly objects of taxation as any other property. But in the case before us the object of taxation is not the franchise of the bank, but property created, or contents made and issued, under the franchise or power to issue bank bills. A railroad company, in the exercise of its corporate franchises, issues freight receipts, bills of lading and passenger tickets, and it cannot be doubted that the organization of railroads is quite as important to the state as the organization of banks; but it will hardly be questioned that these contracts of the company are objects of taxation within the powers of, and not exempted by any relation to, the state which granted the charter of the railroad, and it seems difficult to distinguish the taxation of notes issued for circulation from the taxation of these railroad contracts. Both descriptions of contracts are means of profit to the corporation which

issues them, and both, as we think, may properly be made contributory to the public revenue.

It is insisted, however, that the tax in the case before us is excessive, and so excessive as to indicate a purpose on the part of congress to destroy the franchise of the bank, and is therefore beyond the constitutional powers of congress. The first answer to this is that the judicial, cannot prescribe to the legislative department of the government limitations on the exercise of acknowledged powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people, by whom its members are elected; so that if a particular tax bears heavily upon a corporation or a class of corporations, it cannot therefore be pronounced contrary to the constitution. But there is another answer which vindicates equally the wisdom and the power of congress. It cannot be doubted that under the constitution the power to provide circulation of coin is given to congress, and it is settled by the uniform practice of the government, and by repeated decisions, that congress may constitutionally authorize the emission of bills of credit. It is not important here to decide whether the quality of legal tender in payment of debts can be constitutionally important to these bills, but it is enough to say that there can be no question of the power of the government to emit them, to make them receivable in payment of debts to itself, to fit them for use by those who see fit to use them in all the transactions of commerce, to provide for their redemption in coin or otherwise, and thus to make them a currency uniform in value and description, and convenient and useful for circulation. These powers, until recently, were only partially and occasionally exercised. Lately, however, they have been called into full activity, and congress has undertaken to supply a currency for the entire country. The methods adopted for the supply of this currency were briefly explained in the first part of this opinion. It now consists

of coin, of United States notes, and of the notes of the national banks. Both descriptions of notes are properly described as bills of credit, for both are furnished by the government, both are issued on the credit of the government, and the government is responsible for the redemption of both, primarily as to the first description and alternately as to the second. When these bills shall be made convertible into coin at the will of the holder, this currency will perhaps satisfy as fully the wants of the community as any mixed currency that can be devised.

Having thus, in the exercise of undoubted constitutional power, undertaken to provide a currency for the whole country, it cannot be questioned that congress may constitutionally secure the benefit of it to the public by appropriate legislation. To this end congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community. To the same end congress may discourage by suitable enactments the circulation as money of any notes not issued under its own authority.

Without this power, indeed, its attempt to secure a sound and uniform currency for the country, must be futile. Viewed in this light, as well as in the other light of a duty on contracts or property, we cannot doubt the constitutionality of the tax under consideration. The three questions certified from the circuit court of the district of Maine must, therefore, be answered affirmatively.

*Dissenting opinion by Mr. Justice* NELSON. *Concurred in by Mr. Justice* DAVIS. I am unable to concur in the opinion of a majority of the court in this case. The Veazie Bank was incorporated by the legislature of the state of Maine in 1848, with a capital of $200,000, and was invested with the customary powers of a banking institution, and among others the power of receiving deposits, discounting paper and issuing notes or bills for circulation. The constitutional authority of the state to create these institutions

and to invest them with full banking powers is hardly denied; but it may be useful to recur for a few moments to the source of this authority. The tenth amendment to the constitution is as follows:—

"The powers not delegated to the United States by the constitution, nor prohibited by it to the states are reserved to the states respectively, or to the people."

On looking into the constitution it will be found that there is no clause or provision which, either expressly or by reasonable implication, delegates this power to the federal government which originally belonged to the states, nor any which prohibited it to them. In the discussions on the subject of the creation of the first bank of the United States in the first congress and in the cabinet of Washington in 1790 and 1791, no question was made as to the constitutionality of the state banks. The only doubt that existed and which divided the opinion of the most eminent statesmen of the day, many of whom had just largely participated in the formation of the constitution of the government which they were then engaged in organizing was, whether or not congress possessed a concurrent power to incorporate a banking institution of the United States. Mr. Hamilton in his celebrated report on a national bank to the house of representatives, discussed at some length the question whether or not it would be expedient to substitute the Bank of North America, located in Philadelphia, and which had accepted a charter from the legislature of Pennsylvania, in the place of organizing a new bank. And, although he finally came to the conclusion to organize a new one, there is not a suggestion or intimation as to the illegality or unconstitutionality of this state bank. The act incorporating this bank, passed February 25, 1791, prohibited the establishment of any other by congress during its charter, but said nothing as to the state banks. A like prohibition is contained in the act incorporating the Bank of the United States of 1816. The constitutionality of a bank incor-

porated by congress was first settled by the judgment of this court, in *McCulloch* agt. *The State of Maryland*, in 1819. (4 *Wheaton, p.* 316.) In that case both the counsel and the court recognize the legality and constitutionality of banks incorporated by the states. The constitutionality of the Bank of the United States was again discussed, and decided in the case of *Osborn* agt. *United States Bank*—(9 *Wheaton, p.* 738)—and in connection with this was argued and decided a point in the case of the *United States Bank* agt. *The Planters' Bank of Georgia*, which was common to both cases. The question was whether the circuit courts of the United States had jurisdiction of a suit brought by the *United States Bank* against *The Planters' Bank of Georgia*, incorporated by that state, and in which the state was a stockholder? (*Wheat. pp.* 804, 904.) The court held in both cases that it had.

Since the adoption of the constitution down to the present act of congress, and the case now before us, the question in congress and in the courts has been not whether the state banks were constitutional institutions, but whether congress had the power conferred on it to establish a national bank. As we have said that question was closed by the judgment of this court in *McCulloch* agt. *The State of Maryland*. At the time of the adoption of the constitution there were four state banks in existence and in operation, one in each of the states of Pennsylvania, New York, Massachusetts. and Maryland. The one in Philadelphia had been originally chartered by the confederation, but subsequently took a charter under the state of Pennsylvania. The framers of the constitution were therefore familiar with these state banks, and the circulation of their paper as money, and were also familiar with the practice of the states, which was so common, to issue bills of credit, which were bills issued by the state exclusively on its own credit and intended to circulate as currency, redeemable at a future day. They guarded the people against the evil of this practice of the

state governments by the provision in the tenth section of the first article : " that no state shall emit bills of credit;" and in the same section guarded against any abuse of paper money of the state banks in the following words : " Nor make anything but gold and silver coin a tender in payment of debts." As bills of credit were thus entirely abolished, the paper money of the state banks was the only currency or circulating medium to which this prohibition could have had any application, and was the only currency, except gold and silver, left to the states. The prohibition took from this paper all coercive circulation, and left it to stand alone upon the credit of the bank. It was no longer irredeemable currency, as the banks were under obligation—and including frequently that of its stockholders—to redeem their paper in circulation in gold or silver at the counter. The state banks were left in this condition by the constitution, untouched by any other provision. As a consequence they were gradually established in most or all of the states, and had not been encroached upon or legislated against or in any other way interfered with by acts of congress for more than three-quarters of a century—from 1787 to 1864.

But in addition to the above recognition of the state banks, the question of their constitutionality came directly before this court in the case of *Briscoe* agt. *The Bank of the Commonwealth of Kentucky* (11 *Pet.* 257). The case was most elaborately discussed both by the counsel and the court. The court after the fullest consideration held that the states possessed the power to grant charters to state banks; that the power was incident to sovereignty; and that there was no limitation in the federal constitution on its exercise by the states. The court observed that the Bank of North America, of Massachusetts, and some others, were in operation at the time of the adoption of the constitution; and that it could not be supposed the notes of these banks were intended to be inhibited by that instrument, or that they were considered as bills of credit within its meaning. All

the judges concurred in this judgment, except Mr. Justice STORY. The decision in this case was affirmed in *Woodruff* agt. *Trapnall* (10 *How.* 205), in *Darrington* agt. *The Bank of Alabama* (13 to. 12), and in *Curran* agt. *State of Arkansas* (15 *id.* 317).

Chancellor KENT observes that Mr. Justice STORY in his commentaries on the constitution (*vol.* 3, *p.* 19), seems to be of opinion that independent of the long continued practice from the time of the adoption of the constitution the states would not, upon a sound construction of the constitution, if the question was *res integra,* be authorized to incorporate banks, with a power to circulate bank paper as currency, inasmuch as they are expressly prohibited from coining money. He cites the opinion of Mr. Webster, of the Senate of the United States, and of Mr. Dexter, formerly Secretary of War, on the same side. But the Chancellor observes, the equal, if not the greater, authority of Mr. Hamilton, the earliest Secretary of the Treasury, may be cited in support of a different opinion, and the contemporary sense and uniform practice of the nation are decisive of the question. He further observes: "The prohibition of bills of credit does not extend to bills emitted by individuals, singly or collectively, whether associated under a private agreement for banking purposes, as was the case under the Bank of New York prior to its earliest charter, which was in the winter of 1791; or, acting under a charter of incorporation, so long as the state lends not its credit or obligation or coercion to sustain the circulation. In the case of *Briscoe* agt. *The Bank of the Commonwealth of Kentucky*, he observes: "This question was put at rest by the opinion of the court; that there was no limitation in the constitution on the power of the states to incorporate banks, and these notes were not intended nor were considered as bills of credit." (*Kent's Com., p.* 409; *marg. note of tenth ed.*)

The constitutional power of the states being thus estab

lished by incontrovertible authority to create state banking institutions, the next question is whether or not the tax in question can be upheld, consistent with the enjoyment of this power. The act of congress of July 13, 1866 (4, *Stat. at Large* 146, *s.* 9.), declares that the state banks shall pay ten per cent. on the amount of their notes or the notes of any person or other state banks used for circulation and paid out by them after the 1st of August, 1866. In addition to this tax, there is also a tax of five per cent. per annum upon all dividends to stockholders (13 *P.* 283, 120), besides a duty of one-twenty-fourth of one per cent. monthly upon all deposits, and the same monthly duty upon the capital of the bank (*id.* 277, 110). This makes an aggregate of some sixteen per cent. imposed annually upon these banks. It will be observed that the tax of ten per cent. upon the bills in circulation is not a tax upon the property of the institutions. The bills in circulation are not the property but the debts of the bank, and in their account of debts and credits are placed to the debit side. Certainly no government has yet made the discovery of taxing both sides of this account—debit and credit—as the property of a taxable person or corporation. If both these items could be made available for this purpose a heavy national debt need not create any very great alarm, either as it respects its pressure on the industry of the country for the time being or of its possible duration. The imposition upon the banks cannot be upheld as a tax upon property, neither could it have been so intended. It is simply a mode by which the powers or faculties of the states to incorporate banks are subjected to taxation, and which, if maintainable, may annihilate these powers. No person questions the authority of congress to tax the property of the banks and of all other corporate bodies of a state the same as that of individuals. They are artificial bodies, representing the associated pecuniary means of real persons, which constitute their business capital, and the property

thus invested is open and subject to taxation with all the property, real and personal, of the state. A tax upon this property, and which by the constitution is to be uniform, affords full scope to the taxing powers of the federal government, and is consistent with the power of the states to create the banks, and in our judgment, is the only subject of taxation by this government to which these institutions are liable.

As we have seen in the fore part of this opinion, the power to incorporate banks was not surrendered to the federal government, but reserved to the states, and it follows that the constitution itself protects them, or should protect them, from any encroachment upon this right. As to the powers thus reserved the states are as supreme as before they entered into the Union and are entitled to the unrestrained exercise of them. The question as to the taxation of the powers and faculties belonging to governments is not new in this court. The bonds of the federal government have been held to be exempt from state taxation. Why? Because they were issued under the power in the constitution to borrow money, and the tax would be a tax upon the power; and as there can be no limitation to the extent of the tax, the power to borrow might be destroyed; so in the instance of the United States notes, or legal tenders as they are called, issued under a constructive power to issue bills of credit, as no express power is given in the constitution, they are exempt from state taxation for a like reason, as in the case of government bonds. And we learn from the opinion of the court in this case that one step further is taken, and that is, that the notes of the national banks are exempt as bills of credit issued indirectly by the government, and it follows, of course, from this that the banks used as instruments to issue and put in circulation these notes are also exempt. We are not complaining of this. Our purpose is to show how important it is to the proper protection of the reserved rights of the states that their

Veazie Bank agt. Fenno.

powers and prerogatives should be exempt from federal taxation and how fatal to their existence if permitted.

It is true that the present decision strikes only at the power to create banks; but no person can fail to see that the principle involved affects the power to create any other description of corporations, such as railroads, turnpikes, manufacturing companies and others. This taxation of the powers and faculties of the state governments, which are essential to their sovereignties and to the efficient and independent management and administration of their internal affairs, is, for the first time, advanced as an attribute of federal authority. It finds no support or confidence in the early history of the government, or in the opinions of the illustrious statesmen who founded it. These statesmen scrupulously abstained from any encroachment upon the reserved rights of the states, and within these limits sustained and supported them as sovereign states.

We say nothing as to the purpose of this heavy tax of some sixteen per cent. per annum upon the banks, ten of which we cannot but regard as imposed upon the power of the state to create them, though the purpose is scarcely concealed, in the opinion of the court—namely, to encourage the national banks. It is sufficient to add that the burden of the tax, while it has encouraged these banks, has proved fatal to the existence of those of the states; and if we are at liberty to judge of the purpose of an act from the consequences that has followed it, it is not, perhaps, going too far to say that these consequences were intended.